UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
AT COVINGTON

CIVIL ACTION NO. 2:15-CV-168 (WOB-CJS)

JOHN P. NEBLETT                                        PLAINTIFF

VS.                      MEMORANDUM OPINION AND ORDER

LOUIS J. BROTHERS, ET AL.                              DEFENDANTS


This matter is before the Court on various motions for summary judgment (Docs. 199, 201, 208, 209).

The Court previously heard oral argument on these motions and took the matter under submission.  After further study, the Court now issues the following Memorandum Opinion and Order.

### Factual and Procedural Background

**A. Defendants' Sales of Rad-Chips to Valley Forge**

Valley Forge Composite Technologies, Inc. ("Valley Forge") was a publicly traded company with its principal place of business in Covington, Kentucky.  Valley Forge was purportedly engaged in the production and sale of momentum wheels used by spacecraft for altitude control.  In addition, following the terrorist attacks on September 11, 2001, Valley Forge stated in public filings that it was developing homeland security and counter-terrorism products, including a personal screening system called "ODIN" and a system to detect narcotics, explosives and bio-chemical weapons called

"THOR." (*See* Doc. 215-17, Investor Information). Ultimately, however, the THOR and ODIN systems proved unviable, and Valley Forge never sold a THOR or ODIN device or generated sales, income or profit from them. (Brothers Plea Agreement, Doc. 199-18 at 5; Brothers Depo. Doc. 199-2 at 63).

At all relevant times, Louis Brothers ("Brothers") was Valley Forge's Chief Executive Officer, Chief Financial Officer, and Chairman of the Board of Directors. Brothers' wife, Rosemary, was the company's bookkeeper. Other employees were Kyle Seeger, an engineer; Keith McClellan, General Counsel; Larry Wilhide, Vice-President of Engineering; and Jim Carr, a friend of Brothers.

### 1. Avnet/Xilinx

Avnet, Inc. serves customers in the electronics industry. At all relevant times, Avnet served as a manufacturing representative for a company called Xilinx, Inc. ("Xilinx"). In August 2009, Avnet extended credit to Valley Forge so it could purchase goods through Avnet.

From 2009 to 2013, Valley Forge purchased from Xilinx, through Avnet, electronic components known as radiation hardened chips ("rad-chips"). Rad-chips are designed to resist radiation levels found in space, high altitudes, and nuclear facilities. At the time of these sales, rad-chips were classified as defense articles and their export was regulated by the Arms Export Control Act ("AECA"), 22 U.S.C. §§ 2778-80, the International Traffic in Arms

Regulations ("ITAR"), 22 C.F.R. parts 120-30, the Export Administration Act of 1979 ("EAA"), 50 U.S.C. app §§ 2401-10, and the Export Administration Regulations ("EAR"), 15 C.F.R. parts 730-74. These regulations required any person intending to export defense articles to obtain governmental approval and to file "end-user" certificates with U.S. Customs and Border Protection.

When Valley Forge purchased rad-chips from Avnet, Avnet would obtain the chips from Xilinx. Avnet managed the customer relationship between Xilinx and Valley Forge, and it provided salespeople and engineering personnel to work with Valley Forge.

Xilinx also contracted with Bear VAI, an independent sales representative company based in Kentucky, to service the Valley Forge account. (Chetan Depo. Doc. 203-7 at 3185). Jason Meyer of Bear VAI occasionally visited Valley Forge's office, but Brothers never told Meyer what Valley Forge was doing with the microchips. (Brothers Depo. 57).

In July 2009, Valley Forge placed a large order with Avnet. On July 23, 2009, Avnet's customer care department emailed Brothers and asked for additional information, including end user data. Brothers responded:

> End User (OEM) is Valley Forge until we build it into our product. It could be shipped worldwide. We do not want restricted [] ITAR restricted product.
> Project information: Momentum Wheels and control system for our miniature particle accelerators. May be used in our nuclear explosion detection product but that will be evaluated.

(Doc. 224-1).

In August 2009, Evelyn Morales of Xilinx circulated an email to Xilinx distributors, sales representatives, and customers informing them of new ITAR requirements for certain products. (Doc. 2203-18 at 3241-46). This email specifically noted that ITAR prohibited the export of certain products to China. (*Id.* at 3243). It also attached a sample end-user certificate that customers would be required to complete, as well as a list of products subject to ITAR regulations. This email triggered queries about whether Valley Forge's order was subject to these requirements.

On August 6, 2009, Jason Meyer of Bear VAI stated: "If these are space-grade devices and being exported, then they will need to complete the forms before they can purchase. The customer will have to advise." (Doc. 203-18 at 3239).

On August 27, 2009, Kimberly Marriott of Avnet met with Valley Forge and reported back to Bear VAI:

> I met with the customer today and here is what I found out. Valley Forge is a company that has been in a R&D phase since 911. . (*sic*) Valley Forge is a fully funded company and ready to start this application **which is a Security System for Cargo's called Baldur.** The eau is 500 to 1k but the dollar revenue is 3 to 4 million. There [*sic*] design is done at the Covington location. Prototypes is schedule for December "09" and production soon thereafter.
>
> Question. . . Do they need to fill out forms for this itar?? It's not Space related . . . just wanted to make sure. OR

> do you think I need to send this [to] someone at Xilinx to
> verify?

(Doc. 199-28 at 2635 (bold added).

Bear VAI forwarded this information to Chetan Khona, Regional

Sales Manager at Xilinx, who responded:

> Per the instructions, this in [*sic*] not a part on the list of
> parts that Xilinx has requested us to fill out for ITAR
> purposes.  Having said that, it is eerily close so if Hanneke
> or Evelyn want to comment, that is fine.
>
> I would move forward as if no ITAR requirements are needed.
>
> Nice opp — I don't have too many $3-4M opps fall out of the
> sky on our lap.  Let's be sure to set a goal to learn more
> about this opp as a branch initiative for growth at the next
> review.

(*Id.*).

After further correspondence, Gary Brady of Avnet emailed

Brothers that Chetan Khona of Xilinx had informed him that

"paperwork is not necessary" but if "we find out otherwise we can

always work the issue at that time."  (Doc. 203-18 at 3237).

In January 2010, Valley Forge placed another order with Avnet,

which caused Kimberly Marriott of Avnet to ask him "what

application this is Baldur or Thor perhaps."  (Doc. 224-1 at 4041).

Brothers responded "All products."  (*Id.*).

In September 2010, Xilinx's Export Compliance department

raised a question about one of the end-user certificates submitted

by Valley Forge:

> [A] statement of "Research and Development for data
> acquisition system in radiated environment" seems a little

generic.  Is our sales person knowing and comfortable with what they use these devices with, or do we happened [*sic*] to know the end (satellite) program they are working on?

(Doc. 203-23 at 3283).  This query was forwarded to Avnet and Bear VAI, who in turn communicated with Xilinx's Khona.  Khona responded:

> To answer your question below, these devices are going into body and cargo scanner equipment.  Body scanning as in airport scanner and cargo scanning as counter-terrorism equipment.  These are not space applications.
>
> Attached is more info on the company.

(Doc. 203-23 at 3281).

Upon receipt of this information, Xilinx's Export Compliance responded:

> So does Valley Forge develop and sell body and cargo scanners with our ITAR FPGAs?  By signing our EUC, they have acknowledged that they would be responsible to inform their customers with the ITAR nature of our and their devices and apply ITAR license if their products are ever to be exported. **I will approve the PO based on this understanding, please communicate this message to the customer if we have not yet.**

(Doc. 203-23 at 3280) (emphasis added).

That same day, Gary Brady of Avnet emailed Brothers about the above questions from Xilinx:

> Just a quick note that Xilinx questioned the End Use Cert. that you filled out.  Thanks to Jason and Chetan; they gave some more details concerning your product and Xilinx did approve. **However, Xilinx did want us to remind you that by signing their EUC you have acknowledged that you would be responsible to inform your customers with the ITAR nature of the product and apply ITAR license if your product is exported.**

(Doc. 203-17 at 3234) (emphasis added). Brothers responded:

**"[O]f course."** (*Id.*).

On June 6, 2011, Kimberly Marriott of Avnet emailed Brothers and Kyle Seger at Valley Forge:

> Peter Hache from Xilinx who is Chetan Konan's manager will be coming through the territory the week of July 11th. Peter would like to stop in and introduce himself preferably Wednesday 7/13 at 2:30. Jason Meyer the rep and Myself would also be in attendance for the requested meeting. May I ask if you both can allow a few minutes out of your busy schedule to meet with Peter for a quick introduction?

(Doc. 224-1 at 4043).

The next morning, Seger forwarded the message to Brothers, stating:

> This Peter guy is one of the top guys in Xilinx. He's Chetan's boss. While I was on the phone with Kim, she was saying he wants to come in because he's getting suspicious and is trying to find out what all the parts are being used for.
>
> Figured I'd let you know.

(*Id.*).

On October 2012, Jason Meyer of Bear VAI sent Brothers an email regarding an end-user certificate that Valley Forge had submitted for a purchase from Avnet:

> Lou – here is the hold up. End user cannot state TBD. It has to state a US entity.
>
> If you like, you could list Valley Forge, or state same as above, sign and date.

(Doc. 224-1 at 4044). Brothers responded that he would "take care" of it, and the next day Valley Forge submitted an end-user

certificate that listed Valley Forge as the end user and "THOR-LVX" as the specific end use.  (Doc. 203-6 at 3152).

### 2. **Aeroflex/Quality Components**

Another company called Aeroflex also sold rad chips to Valley Forge through its representative Quality Components ("QC").[1]

In an email dated January 14, 2008, Brothers requested a quote for certain chips from John McDonough at QC, stating "We only want parts that are unregulated."  (Doc. 199-27 at 2618).  Aeroflex, through QC, responded with a quote that noted that completed State Department End User Certificates would be required for the purchase of any ITAR-regulated items.  (Doc. 199-27 at 2617-2633).  Those certificates required Valley Forge to agree to comply with U.S. export laws governed by ITAR.  (*Id.* at 2633).

This January 2008 inquiry did not result in any purchase by Valley Forge from Aeroflex.  (Rush Decl. Doc. 215-4 at 3635).  It was not until June 2009 — a year and a half later — when Aeroflex shipped its first order to Valley Forge.  (Rush Decl. Exh. B. Doc. 215-4 at 3640-43).

On August 26, 2009, Jim Rush, Regional Sales Manager for Aeroflex, emailed Brothers:

> I spoke to our Export Compliance manager to understand the
> rules with respect to exporting Aeroflex Colorado Springs

---

[1] Originally named as a defendant herein, Quality Components has settled with the Trustee.

devices.  He sent me the attached regulations that I have included for your review.

**He mentioned that the rules have gotten tighter over the last couple of years and virtually everything that Aeroflex Colorado Springs makes for space requires a state department license to ship out of country.**

**I double checked the specific parts list that we quoted to you on 8/24/09 and all the parts fall under state department rules (including the devices with an "L" radiation designator).  Also parts shipped to you earlier this year would be included under the state department rules.**

(Doc. 215-7 at AERO0021918) (emphasis added).

Rush testified that he asked Brothers several times how Valley Forge intended to use the microchips, and Brothers told him that the chips were to be used in reaction wheels and the THOR and ODIN systems.  (Rush Decl. Doc. 215-4 at 3636; Doc. 215-23 at 3850, internal Aeroflex email from Rush for Valley Forge order for Odin and Thor systems).

In January 2013, in response to a concern raised by an Aeroflex Regional Sales Manager, Rush asked Brothers if any of the material Valley Forge purchased from Aeroflex was being exported to China, and Brothers stated that it was not.  (Rush Decl. Doc. 215-4 at 3636, Doc. 215-8 at AERO0012712).

### 3. Valley Forge's Export of Chips and What It Told the Supplier Defendants

Aeroflex and Avnet shipped the rad-chips to Valley Forge in Kentucky.  Brothers' plea agreement describes what Valley Forge then did with the chips:

VFCT's office contained an interior room with no windows and one entrance. This room was used to repackage the microcircuits for export. This room was secured by a lock the Defendant had installed on the door to safely store the microcircuits and limit access to them. When the microcircuits were delivered to the office, the Defendant and others would remove the microcircuits from their original packaging, which was designed to insure the integrity of the microcircuits during shipping. The Defendant and others would then repackage the microcircuits in Federal Express (FEDEX) packaging for export. They often marked the FEDEX packages as "computer memory chips" and understated the value of the contents. The Defendant and others insured the original packaging and labels were destroyed or shredded. The Defendant and others would then export the microcircuits to Hong Kong and the PRC by FEDEX.

(Doc. 199-18 at 5).

Valley Forge did not tell the suppliers that the microchips were being purchased to sell to customers in Hong Kong. (Brothers Depo. 71-72, 79; Brothers Depo. Doc. 215-2 at 3619). Instead, Brothers falsely told the suppliers that the chips were being purchased for use in the THOR and ODIN systems. (Brothers Depo. 76; Marriott Depo., Doc. 203-10 at 3199; Rush Depo., Doc. 199-32 at 2657; Seger Depo. Doc. 231-4 at 5991). Seger testified that Brothers instructed him not to tell the suppliers that the chips were being repackaged and sold overseas. (Seger Depo. 203-11 at 79, 140). Carr also testified that he never told Avnet, Aeroflex, or Xilinx that the chips were going to be shipped overseas. (Carr Depo. Doc. 203-12 at 3207).

Brothers and Seger also submitted to Avnet and Xilinx "End-User Certificates" which stated, falsely, that the products would

not be exported by Valley Forge.[2] Brothers, who was ultimately prosecuted criminally, swore in his plea agreement that he falsified the end-user certificates that Valley Forge submitted to suppliers or that he failed to return them. (Doc. 199-18 at 5). He also so testified in his deposition in this matter:

> Q. And you would falsify these end-user statements, stating the microcircuits were for application in THOR or ODIN and would not be exported from the United States, correct?
>
> A. Correct.

(Brothers Depo. 66) (Doc. 203-3). *See also* Brothers Depo. 75-76.[3]

Brothers testified that from 2008 to 2013, Valley Forge never submitted end-user certificates to Aeroflex. (Brothers Depo. Doc. 224-1 at 3999; Brothers Depo. Doc. 215-2 at 3618). Brothers further swore in his plea agreement that one end-user statement for a purchase from Aeroflex that showed the People's Republic of China as the intended destination of those products was never returned to Aeroflex. (Doc. 199-18 at 6; Brothers Depo. Doc. 215-2 at 3616). Brothers further swore that he falsified or failed to return the end-user statements to avoid detection. (*Id.*).

---

[2] The Avnet end-user certificates required Valley Forge to acknowledge its responsibility to comply with all export laws and regulation. *See, e.g.,* Doc. 203-6 at 3092.

[3] All the end-user certificates that Valley Forge submitted to Avnet are at Exhibit F to the Declaration of Benedict Hur, which is attached to Xilinx and Avnet's Joint Motion for Summary Judgment. (Doc. 203-6). They span October 2009 to February 2013.

Brothers also swore in his plea agreement that Valley Forge falsified its public filings:

> In general, Defendant represented to the SEC and investors that VFCT's revenues and profits were from the sale of various aerospace products and other mechanical devices including momentum wheels, but implied that sales of THOR and ODIN were imminent when they were not. In addition, the Defendant in March 2008, represented VFCT was in the business of buying and selling electronic parts for resale to foreign markets, primarily Japan. In fact, almost all of the revenues and profits of VFCT between 2009 and January, 2013 were from the export of microcircuits to Hong Kong and the PRC without a license or written permission of the Department of State.

(Doc. 199-18 at 2541). *See also* Valley Forge Form 10-K dated April 13, 2010 (Doc. 203-1) (touting the THOR and ODIN products).

In 2010, when Valley Forge's revenues jumped from $250,000 to $12 million, the company's auditor told Brothers that Valley Forge would have to disclose on its Form 10-K the source of this revenue. Brothers refused and fired the auditor. (Hawkins Depo. at 19-20, Doc. 199-12).

Between 2009 and 2012, most of the revenue that Valley Forge earned was from the illegal sale of the microchips overseas. (Brothers Depo. 46) (Doc. 203-3). Brothers testified that the revenue from those sales was around $37-$40 million, and that Valley Forge kept it all. (Brothers Depo. Doc. 199-2 at 81-82). The monies received from the sale of the microchips to Hong Kong were deposited into Valley

Forge general accounts and used to pay the company's operating expenses, such as rent, employee compensation, professional services, working capital, and debt repayment. (R. Brothers Depo. Doc. 203-13 at 3213-14 and Doc. 199-5 at 120-24; Bradley Depo. Doc. 203-19 at 3250-51; Brothers Depo. At 201-09, Doc. 199-9; Gilinsky Depo. at 76, Doc. 199-25).

### C. **Criminal Prosecution and This Litigation**

The Department of Justice discovered Brothers' illegal scheme and, in February 2013, the government seized Valley Forge's bank accounts, files, and computers.[4]

In the meantime, when Valley Forge failed to pay Avnet, Avnet filed a diversity suit in this Court on April 8, 2013, alleging claims for breach of contract, action on account, and quantum meruit/unjust enrichment. *Avnet, Inc. v. Valley Forge Composite Tech., Inc.*, Cov. Case No. 13-cv-051. Valley Forge defaulted, and this Court entered a default judgment in Avnet's favor on September

---

[4] Brothers was ultimately indicted in 2014, along with his wife, on various federal criminal charges related to the illegal export of these items. He pled guilty to some of the charges in 2015, and Judge Amul Thapar sentenced him to 93 months imprisonment on March 2, 2016. *United States v. Brothers*, Cov. Crim. Case. No. 14-35.

Rosemary Brothers pled guilty to Misprision of Felony for her role in assisting her husband in the illegal export of the microchips. (Doc. 199-29 at 2638-48). Judge Thapar sentenced her to three years' probation. Cov. Crim. Case No. 15-28, Doc. 31.

17, 2013 in the amount of $673,803.25. (Case 13-cv-51, Doc. 25). Valley Forge then moved to have the default judgment set aside. Before this Court ruled on that motion, Valley Forge filed for bankruptcy in the United States Bankruptcy Court for the Middle District of Pennsylvania. This Court thus stayed the case and denied all pending motions without prejudice.

### D. Proceedings in the Bankruptcy Court

Avnet and other creditors of Valley Forge, including Aeroflex Colorado Springs, Inc. ("Aeroflex CS"), filed proofs of claim in the Bankruptcy Court for the money that Valley Forge owed them. Valley Forge requested discovery under the bankruptcy rules to investigate whether potential claims could be brought against Avnet and others for involvement in Brothers' illegal scheme. The Bankruptcy Court allowed discovery as to Avnet but declined to allow discovery as to Xilinx.[5]

---

[5] In the meantime, two executives of Valley Forge filed a *qui tam* action in this Court on January 31, 2014, against Avnet, Xilinx, Inc., and Aeroflex Inc., alleging violations of the False Claims Act in connection with the rad-chip sales to China. *Levine v. Avnet, Inc.*, Cov. Civil Case No. 14-17. The United States declined to intervene and ultimately moved the Court to dismiss the case, stating that it was in the best interest of the United States to "avoid expending any further resources on the action." (Doc. 20-1). After a hearing, and over the relator's objection, the Court granted the government's motion to dismiss on April 1, 2015.

Valley Forge's Chapter 11 case was converted to a Chapter 7 proceeding, and John P. Neblett was appointed as Trustee on February 18, 2015.

On June 15, 2015, the Trustee in Bankruptcy filed an Adversary Complaint in the Bankruptcy Court, asserting claims against Brothers, Avnet, Aeroflex Inc., Aeroflex CS, Quality Components, Inc., and Xilinx, Inc. (Cov. Civil Case No. 15-168, Doc. 115-2).[6] The claims asserted by the Trustee are:

Count I:      Breach of fiduciary duty against Brothers;

Count II:     Civil conspiracy/aiding and abetting breach of fiduciary duty against the other defendants;

Count III:    Negligence against the defendants other than Brothers;

Counts IV & V: Objections to Avnet's and Aeroflex's proofs of claim filed in the underlying bankruptcy case.[7]

---

[6] Brothers filed an answer to the Adversary Complaint in the Bankruptcy Court, but does not appear to have made any further filings. The Trustee has not moved for summary judgment on the claim it asserts against Brothers in this matter. The Court assumes that the Trustee does not intend to proceed against Brothers given the circumstances, but it will require the Trustee to state its position on the record.

[7] These objections are derivative of the Trustee's tort claims.

Generally, the Trustee's claims are based on allegations that the supplier defendants were acting in concert with Brothers to circumvent the federal restrictions on the chips' export to China.[8]

On August 3, 2015, Avnet filed in the Bankruptcy Court a motion to dismiss the adversary complaint against it, arguing that the claims were barred by *res judicata* because they were never asserted as counterclaims in Avnet's 2013 case in this Court. (Doc. 65). Avnet then filed a motion to withdraw the adversary claims against it from reference to the Bankruptcy Court and to transfer venue of those claims to this Court under 28 U.S.C. § 1404(a). (Case 15-168, Doc. 1). The District Court for the Middle District of Pennsylvania granted that motion on September 21, 2015. However, instead of transferring only the claims against Avnet, the Court withdrew the entire adversary action from the Bankruptcy Court and transferred it to this Court. (Case No. 15-168, Doc. 16).[9]

Thereafter, the Clerk of Court created a new case for the transferred action, Covington Civil Action 15-168.

---

[8] These allegations are very similar to those made in the *qui tam* suit.

[9] The Trustee also filed a second adversary complaint against certain professional service providers to Valley Forge, including its accountant, auditors, and attorneys, alleging that they committed negligence and breached their fiduciary duties in their services, allowing Brothers to carry out his illegal scheme. (Doc. 79-2).

After transfer, the Aeroflex defendants and Xilinx also filed a motion to dismiss. (Doc. 79).

Following briefing and a hearing, the Court denied the motions to dismiss. (Doc. 126). The Court found that Avnet's *res judicata* argument was without merit. (*Id.*). The Court also held that it would be premature to apply the *in pari delicto* defense at the pleading stage, but it noted that defendants could renew that defense on summary judgment.

Now, after these complex proceedings, the parties have conducted discovery and filed motions for summary judgment, which are ripe for resolution.

### *Analysis*

## A. Count II: Civil Conspiracy/Aiding and Abetting Fiduciary Breach [10]

### 1. Elements of this Claim

Although the Trustee has labelled Count II of the adversary complaint "Civil Conspiracy/Inducing, Facilitating and Aiding and Abetting Breach of Fiduciary Duty," there is no legal distinction between those two theories under Kentucky law. *See Community Ties of America, Inc. v. NDT Case Services, LLC*, No. 3:12-CV-00429,

---

[10] The Court will not address at length Avnet's argument that the Trustee's claims against it are barred by *res judicata*. The Court rejected that argument in its Order of June 26, 2016 (Doc. 126), and the same reasoning applies at this stage.

2015 WL 520960, at *17 (W.D. Ky. Feb. 9, 2015) (citing *Steelvest,*
*Inc. v. Scansteel Serv. Ctr., Inc.*, 807 S.W.2d 476, 485 (Ky.
1991)).  Rather, such a claim is appropriately analyzed as simply
an aiding and abetting claim.  *Id.* (citations omitted).

To prevail on this claim, the Trustee must show: "(1) the
existence and breach of a fiduciary duty; (2) the defendant gave
the breaching party 'substantial assistance or encouragement' in
effectuating the breach; and (3) the defendant knew that the
party's conduct breached that fiduciary duty." *Sierra Enter. Inc.*
*v. SWO & ISM, LLC*, 264 F. Supp.3d 826 (W.D. Ky. 2017) (internal
quotation and citation omitted).

"Under Kentucky law, constructive knowledge is not sufficient
to support a claim of aiding and abetting; instead, a plaintiff
must show that a defendant had actual knowledge that a tortfeasor
was engaged in wrongful conduct." *Great Am. Inc. Co. v. Poynter*,
Civil Action No. 1:10-CV-00161, 2013 WL 1181445, at *4 (W.D. Ky.
Mar. 20, 2013) (citation omitted). *See also Miles Farm Supply, LLC*
*v. Helena Chem. Co.*, 595 F.3d 663, 666 (6th Cir. 2010) (same).

"Although 'actual knowledge' is required, the requisite
intent and knowledge may be shown by circumstantial evidence."
*Sierra Enter.*, 264 F. Supp. 3d at 840 (internal quotations and
citation omitted).

## 2. Knowledge of Brothers' Breach of Fiduciary Duty

Despite the voluminous record in this matter, the Trustee has failed to adduce any evidence from which a reasonable juror could conclude that the supplier defendants had actual knowledge that Brothers was illegally exporting the microchips that Valley Forge purchased from them. Instead, as discussed above, Brothers took affirmative steps to conceal his actions from defendants and mislead them — as well as investors and the stock market — that the chips were being used in momentum wheels and the ODIN and THOR systems.

Brothers gave sworn testimony on three occasions prior to responding to summary judgment: (1) in his sworn plea agreement dated July 30, 2015; (2) in his deposition in the Bankruptcy Court on June 3, 2014; and (3) in his deposition in this case taken on March 14 and 15, 2017. On those occasions, Brother swore that he never told the supplier defendants that he was exporting the chips; that he instead falsely told them that the chips were being used in ODIN and THOR; that he falsified the end user certificates that he submitted to Avnet/Xilinx to show that Valley Forge was the end user; that he never submitted end user certificates to Aeroflex; that one Aeroflex end user certificate that showed the Hong Kong company as the end user was never returned to Aeroflex; and that he did these things to avoid detection.

In opposition to summary judgment, however, the Trustee submitted a declaration in which Brothers declares that "each of the Supplier Defendants knew and was fully aware, from the beginning of our relationship, that the micro-chip components which they supplied me were destined for overseas." (Doc. 226 at ¶ 19).[11]

The Sixth Circuit has "long held that a party may not create a factual issue by filing an affidavit, after a motion for summary judgment has been made, which contradicts [his] earlier testimony." *Bush v. Compass Group USA, Inc.*, 683 F. App'x 440, 448 (6th Cir. 2017) (citation and internal quotations omitted).

"A directly contradictory affidavit should be stricken unless the party opposing summary judgment provides a persuasive justification for the contradiction." *Id. See also Powell-Pickett v. AK Steel Corp.*, 549 F. App'x 347, 352 (6th Cir. 2013) ("The rule therefore is that a party opposing summary judgment with an affidavit that contradicts her earlier deposition must explain why she disagrees with herself.").

---

[11] The Trustee first attached this declaration to his motion for summary judgment (Doc. 208-1); however, the declaration was not executed. It was not until October 30, 2017, that the Trustee filed a copy of the declaration executed by Brothers. (Doc. 226).

This rule applies equally to proffered affidavits that attempt to retract admissions made in a criminal plea agreement. *See Scholes v. Lehmann*, 56 F.3d 750, 762 (7th Cir. 1995).

The Sixth Circuit has explained the reasoning for this "sham affidavit" doctrine:

> The rationale behind the doctrine, which is applied in some form in nearly every circuit, is simple: [i]f a party who has been examined at length [under oath] could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact.

*France v. Lucas*, 836 F.3d 612, 622 (6th Cir. 2016) (internal quotations and citations omitted).

Although defendants stressed the contradictory nature of Brothers' declaration in their responses to the Trustee's motion for summary judgment, the Trustee has made no effort to state a "persuasive justification" for Brothers' new assertions. In fact, the Trustee does not acknowledge the issue at all. *See France*, 836 F.3d at 624 ("Finally, the plaintiffs have utterly failed to provide an explanation for the conflict between Bray's affidavit and his previous testimony at Lucas's trial.").

Under such circumstances, the Sixth Circuit has held that a district court should decline to consider the contradictory statements and is further within its discretion

to strike the declaration in its entirety. *Bush*, 683 F.3d 448.

Disregarding Brothers' inadmissible post-deposition declaration, the record is devoid of any evidence from which one could reasonably infer that the supplier defendants knew that Brothers was illegally exporting the microchips in violation of his fiduciary duty to Valley Forge.

The supplier defendants are thus entitled to summary judgment on Count II of the adversary complaint.

## B. <u>Count III: Negligence</u>

To prevail on a negligence claim under Kentucky law, the plaintiff must prove that the defendant 1) owed the plaintiff a duty of care, 2) the defendant breached the standard of care by which his or her duty is measured, and 3) that the breach was the legal causation of the consequent injury. *Simons v. Strong*, 978 F. Supp.2d 779, 783 (E.D. Ky. 2013) (citing *Pathways, Inc. v. Hammons*, 113 S.W.3d 85, 88-89 (Ky. 2003)).

The element of duty is a question of law for the court to decide. *Id.*

Negligence *per se* is codified in KRS 446.070, which provides a cause of action for any person injured by "the violation of any statute." However, the "any statute" language applies to Kentucky statutes. *St. Luke Hosp., Inc. v. Straub*, 354 S.W.3d 529, 534 (Ky. 2011) (citations omitted). "Violations of federal laws and

regulations . . . do not create a cause of action based on KRD 446.070." *Id.*

Here, the Trustee was asked in interrogatories to state the basis for his allegation that the supplier defendants owed a duty to Valley Forge. The Trustee responded:

> Defendant Xilinx had a duty to refrain from engaging in any conduct that would jeopardize and imperil Valley Forge by causing it to be in violation of federal rules and regulations relating to the trafficking in controlled articles.

Doc. 203-20 Doc. 199-19.

Similarly, in his motion for summary judgment on the negligence claim, the Trustee states:

> Defendants knew, and it was foreseeable, that their conduct placed Valley Forge in jeopardy for potential violations of the AECA and the ITAR. As such, they had a duty to refrain from all such conduct.

(Doc, 208-12 at 9).

Invoking federal statutes, however, does not give rise to a cause of negligence under Kentucky law.

In his reply brief in support of summary judgment, the Trustee states that he is relying on a common law negligence theory under Kentucky law. (Doc. 244 at 9).

However, any common law claim fails as a matter of law because there is no duty flowing from the supplier defendants to Valley Forge under the undisputed facts.

"For a common-law negligence claim, the standard of care is that of the ordinary care that a reasonably prudent person would exercise under the circumstances." *Simons*, 978 F. Supp.2d at 784 (internal quotations and citations omitted). Under Kentucky's "universal" duty of care, "every person owes a duty to every other person to exercise ordinary care in his activities to prevent foreseeable injury." *James v. Meow Media, Inc.*, 300 F.3d 683, 690 (6th Cir. 2002) (quoting *Grayson Fraternal Order of Eagles v. Claywell*, 736 S.W.2d 328, 332 (Ky. 1987)).

This duty is "circumstantially limited: the duty is to exercise ordinary care to prevent *foreseeable* harm." *Id. See also Grand Aerie Fraternal Order of Eagles v. Carneyhan*, 169 S.W.3d 840, 849 (Ky. 2005)) (noting that the "universal duty of care" is "not boundless").

The foreseeability inquiry boils down to "whether a plaintiff's interests are entitled to legal protection against the defendant's conduct." *Id.* at 691 (citation omitted). This is a pure question of law for the court. *Id.*

Here, the harm to Valley Forge is alleged to flow from defendants' failure to abide by the federal statutes and regulations governing the export of the rad-chips and similar military grade components. But these laws were designed to protect national security and foreign policy, not to protect companies from deceit and financial harm caused by their executives.

Preventing harm to Valley Forge is thus not within the scope of these laws' purposes, such that the harm to it as a result of their alleged violation was not "foreseeable." Thus, the Trustee has failed to demonstrate a common law duty owed to Valley Forge by the supplier defendants. *Compare T&M Jewelry, Inc. v. Hicks*, 189 S.W.3d 526, 531 (Ky. 2006) (finding that common law duty of care rose from Gun Control Act as to plaintiff who was injured by gun illegally sold by defendant to person under eighteen years old; principal purpose of Act was to limit access to handguns by persons under age twenty-one).

The Trustee wholly fails to address these defects, arguing in his reply brief only that defendants cannot now raise the duty issue because the Court allowed the case to proceed beyond the pleading stage. (Doc. 227 at 15-18). This misplaced "law of the case" argument is without merit, as the Court may always consider on summary judgment issues on which it reserved at the pleading stage.

For these reasons, therefore, the Court will grant the supplier defendants' motions for summary judgment on the Trustee's negligence claim.[12]

---

[12] Dismissal of the substantive claims against the supplier defendants also means that Counts IV and V — the Trustee's objections to defendants' claims in the bankruptcy case — fail because they depend on a finding in favor of the Trustee on the aiding and abetting and negligence causes of action.

## C. *In Pari Delicto*

Even absent the above deficiencies, the Court concludes that the Trustee's claims fail under the doctrine of *in pari delicto*.

"*In pari delicto* refers to the plaintiff's participation in the same wrongdoing as the defendant." *In re Dublin Securities, Inc.*, 133 F.3d 377, 380 (6th Cir. 1997) (internal quotations and citation omitted). "The doctrine is premised upon the equitable principle that [n]o Court will lend its aid to a man who founds his cause of action upon an immoral or illegal act." *Id.*

In *Dublin Securities*, the Sixth Circuit applied the *in pari delicto* doctrine to bar claims of a bankruptcy trustee, standing in the shoes of a debtor, against third parties where the debtor had carried out a fraudulent stock offering. The trustee alleged that the third parties — law firms who had represented the debtor and prepared many of the documents for the securities sales — knew or should have known of the illegal activities and failed to apprise the businesses of them.

The District Court dismissed the claims on a Rule 12(b)(6) motion, and the Sixth Circuit affirmed, reasoning that the trustee's complaint on its face showed that "the debtor's own actions were instrumental in perpetrating the fraud on the individuals choosing to invest in the Dublin Securities schemes." *Id.* The Court stated that "[s]uch "purposeful conduct thus

establishes conclusively that the debtors were *at least* as culpable as the defendants in this matter." *Id.*

Here, it is abundantly clear that Brothers was the moving force in his scheme to acquire rad-chips and illegally export them to China, notwithstanding any alleged involvement by the supplier defendants. Indeed, the very first count in the complaint is against Brothers for breach of his fiduciary duties to Valley Forge due to his "illegal and criminal activities." (Compl. ¶ 94).

And the Trustee conceded in interrogatory responses that Brothers "provided untrue and deceptive information on the End Use Certificates" provided to Xilinx. (Doc. 203-21 at 3264).

Further, as noted above, Brothers' plea agreement sets out in detail the deliberate actions he took to acquire the microchips and to falsify the end user forms provided to defendants to conceal his plans to export the chips to Hong Kong. Likewise, his deposition testimony confirms that he falsely told defendants that the chips were for use in the ODIN and THOR systems. And when directly asked by Jim Rush of Aeroflex whether Brothers was exporting the chips to China — one month before the government seized Valley Forge's business — Brothers lied and said he was not.

As a matter of law, therefore, Brothers was thus "at least as culpable" as the defendants in the illegal export scheme, making this doctrine applicable.

To avoid this result, the Trustee invokes the "adverse interest" exception to the *in pari delicto* doctrine. (Doc. 225 at 26-27). This exception provides that knowledge of the agent (Brothers) is not imputed to the principal (Valley Forge) when it is clear that the agent would not communicate the fact in controversy to the principal, such as where the communication would prevent the consummation of a fraudulent scheme the agent was perpetrating. *In re: Merv Properties, L.L.C.*, 539 B.R. 516, 529 (B.A.P. 6th Cir. 2015) (citing *Illinois Cent. R. Co. v. Fontaine*, 289 S.W. 263, 267-68 (Ky. 1926)).

"However, the adverse interest exception is not applicable when the company actually benefits from the transaction in question." *Id.* (citation omitted). *See also BancInsure, Inc. v. U.K. Bancorporation Inc./United Ky. Bank of Pendleton Cnty, Inc.*, 830 F. Supp.2d 294, 302-03 (E.D. Ky. 2011) (noting that Kentucky courts recognize exception to adverse interest exception where the corporation benefits by the transaction).

Valley Forge's SEC filings and the Trustee's adversary complaint against Valley Forge's attorneys and accountants reveal that Brothers' illegal export of the rad-chips directly benefitted the company. In the second adversary complaint, the Trustee alleges that "all the revenue generated by Valley Forge during the period 2009 through January 2013 was from the purchase and sale of rad-chips." (Doc. 79-2, ¶ 60).

The undisputed record in this case also shows that, between 2009 and 2012, virtually all revenue earned by Valley Forge came from the microchip sales. (Brothers Depo. 46). Valley Forge retained approximately $37 to $40 million in those revenues and used them to pay the company's operating expenses and to purchase more microchips.

Brothers himself testified that the sale of the microchips to the Pacific Rim was a means of getting access to those markets in preparation for the sale of other products in the future:

Q. So as you told Ben, it brought money into Valley Forge?

A. In the prospects of future —

Q. Right. And opened up business relationships?

A. Correct.

(Doc. 199-2 at 2377).

Further, in its public filings, Valley Forge disclosed that it was not making any money on the THOR and ODIN products that it claimed to be developing, but nonetheless the company's profits from 2009 to 2010 increased from $259,000 to $2.5 million. (Doc. 79-3).

Thus, no reasonable person could conclude that Valley Forge did not benefit from Brothers' illegal activities.

The Trustee attempts to create an issue of fact on the question of benefit through the declaration of Evan Levine, a

person who became a board member in February 2013, *after* the Department of Justice seized Valley Forge's accounts.[13]

Levine states in his proffered declaration that he performed an investigation that revealed that Brothers had "diverted" funds from the sale of the microchips to himself, his son, and another business he owned. (Doc. 224-27).

This creates no triable issue. Levine's declaration is inadmissible because the Trustee never identified Levine as a witness during discovery. *See* Fed. R. Civ. P. 37(c)(1) ("If a party fails to . . . identify a witness as required . . ., the party is not allowed to use that . . . witness to supply evidence on a motion . . .").

Second, even if Brothers later diverted some of the revenues to himself, it is undisputed that Valley Forge still benefitted to the tune of millions of dollars in revenues that allowed it to stay afloat for years.

The Trustee argues that Brothers' scheme actually harmed Valley Forge because his scheme led to the ultimate downfall of the company. However, that ultimate outcome does not negate the fact that, for approximately four years, Valley Forge received millions of dollars in revenue as a result of the illegal rad-chip sales, absent which the company would likely have failed sooner.

---

[13] Levine was one of the two relators in the *qui tam* case.

Moreover, Brothers' fraud was not directed at Valley Forge but rather at federal authorities whose export restrictions he violated. Rejecting a similar argument, another court has stated:

> {W]hen an officer or director's actions were not undertaken to loot or defraud his corporation and the corporation derived some benefit from them, the actions are imputed to the corporation, *even if they ultimately resulted in the failure of the corporation*. . . .

> It is uncontested that BLI received the prevailing rate of interest for the triangular transactions and that, in some instances, BLI received an additional fee from BNLV attributable to the triangular transactions. *As discussed above, the deception or fraud motivating the triangular transaction scheme was not targeted at BLI but at federal regulators. BLI, as well as its parent companies BLCA and BLNV, temporarily benefitted from the triangular transaction scheme.* Thus, Defendants' knowledge of the triangular transactions and their actions in executing the triangular transactions are imputed to BLI.

*Banco Latino Int'l v. Gomez*, 95 F. Supp.2d 1327, 1336 (S.D. Fla. 2000) (citation omitted) (emphasis added).

Therefore, because Valley Forge directly benefitted from Brothers' unlawful actions, the adverse interest exception does not apply, and the Trustee's claims are barred by *in pari delicto*.


Therefore, having heard from the parties, and the Court being advised,

**IT IS ORDERED** that:

(1) Defendants' motions for summary judgment (Docs. 199, 201) be, and are hereby, **GRANTED**, and the claims against them are hereby **DISMISSED WITH PREJUDICE**;

(2) The Trustee's motions for summary judgment (Docs. 208, 209) be, and are hereby, **DENIED**; and

(3) **On or before July 9, 2018**, the Trustee shall file a stipulation dismissing defendant Brothers from this action or a status report stating how he otherwise intends to proceed against Brothers.

This 3rd day of July, 2018.



Signed By:

*William O. Bertelsman* WOB

**United States District Judge**